**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**PETER A. ANDERSON**

**v.** **No. 08-260**
**Judge Emily C. Hewitt**

**THE UNITED STATES**

**MEMORANDUM IN SUPPORT OF**
**<u>PLAINTIFF'S OBJECTION TO DEFENDANTS MOTION TO DISMISS</u>**

Christopher A. Anderson
P.O. Box 46
N. Scituate, RI 02857
401 647-1400 fax: 401 647-1446

Attorney for Plaintiff

# TABLE OF CONTENTS

| | | |
|---|---|---|
| STATEMENT OF THE CASE | | 1 |
| STATEMENT OF THE ISSUES RAISED BY DEFENDANT UNDER RULES 12(b)(1) and 12(b)(6) | | 2 |
| DEFENDANT'S 12(b)(1) ARGUMENTS | | 2 |
| 1) | Alleged Procedural Defect of Plaintiff's Counsel for Failing to Properly Plead the Basis for this Court's Jurisdiction | 2 |
| 2) | Response to Defendant's Allegation that the Plaintiff's Claims are not "Money-Mandating" so as to Invoke the Statutory Jurisdiction of the Tucker Act | 3 |
| | 38 U.S.C. §3732(a)(1) is "Money-Mandating" as to Mr. Anderson | 5 |
| | 38 C.F.R. § 1.967 is "Money-Mandating" as to Mr. Anderson | 7 |
| | General Statutory Scheme of Congress in Creating the Veteran's Administration | 8 |
| DEFENDANT'S 12(B)(6) ARGUMENTS | | 10 |
| Applicable Standard | | 10 |
| Arguments Advanced by Defendant in Support of 12(b)(6) Motion to Dismiss | | 11 |
| 1) | Mischaracterization of the Plaintiff's Claim and Argument | 11 |
| 2) | Defendant's Attempted Reliance on State Law of Title Conveyance to Overcome the Reality of Federal Law | 13 |
| 3) | Defendant's Claim That Changes to the Law Since 1989 Require the Veteran's Administration to Keep Any Surplus | 16 |
| CONCLUSION | | 20 |

## TABLE OF AUTHORITIES

### RULES


| | |
|---|---|
| Rule 3.1, Federal Court of Claims Rules of Civil Procedure | 2, 3 |


### STATUTES AND REGULATIONS


| | |
|---|---|
| 26 U.S.C. §108 | 12 |
| 28 U.S.C. §1491 (Tucker Act) | 2, 3, 6 |
| 38 U.S.C. §3732(a)(1) | 3, 5, 6, 17 |
| 38 U.S.C. §5302 | 8, 20 |
| 38 C.F.R. §1.967(d) | 3, 7, 8, 11, 20 |
| 38 C.F.R. §36.4321 | 16 |
| 38 C.F.R. §36.4323(e) | 6, 16, 18 |


### CASES


| | |
|---|---|
| Fitzgerald v. Cleland, 650 F.2d 360 (1st Cir. 1981) | 9, 10, 13-17, 19 |
| Gatter v. Nimmo, 672 F.2d 343 (3rd Cir. 1982) | 5, 6, 17 |
| Carter v. Derwinski, 987 F.2d 611 at 622 (9th Cir. 1993) | 16 |
| Eubanks v. United States, 25 Cl. Ct. 131 (Cl. Ct. 1992) | 3 |
| Sharpe v. United States, 80 Fed. Cl. 422 (Fed. Cl. 2008) | 4 |
| Davis v. Nat'l Homes Acceptance Corp., 523 F. Supp. 477 at 479 (D.C. Ala. 1981) | 16 |
| Grant v. United States Dep't of Veterans Affairs, 827 F. Supp. 418 (S.D. Tex. 1993) | 10, 13-16 |

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**PETER A. ANDERSON**

**v.**

**No. 08-260**
**Judge Emily C. Hewitt**

**THE UNITED STATES**

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFF'S OBJECTION TO DEFENDANTS MOTION TO DISMISS**

**STATEMENT OF THE CASE**

It should be noted at the outset that there is no dispute as the underlying material facts of this case. All of the relevant facts are a matter of public record and the Plaintiff does not dispute the facts as recited by the Defendant on page 3 of its Brief.

The instant controversy stems from the default on a mortgage given by the Plaintiff to Wells Fargo Home Mortgage, Inc., as the same was guaranteed under the Veteran's Administration Loan Guarantee Program. Upon default for non-payment, Wells Fargo initiated an action in the Seminole County Circuit Court to foreclose and take title to the Plaintiff's home. A foreclosure sale was conducted and the Veteran's Administration (VA) was the highest bidder. Approximately five months later, the Administration sold the property to a third party, simultaneously realizing approximately $65,000 over and above the amount the VA expended under its guarantee and other sums advanced on behalf of Mr. Anderson. The matter is before this Court to determine whether or not the VA is permitted under Federal law to retain surplus funds over and above the amount expended by the VA on behalf of a Veteran.

**STATEMENT OF THE ISSUES RAISED BY DEFENDANT UNDER RULES 12(b)(1) and 12(b)(6)**

The Defendant makes two jurisdictional arguments in support of its Motion to Dismiss under Rule 12(b)(1). The first is primarily procedural in alleging that the Plaintiff failed to properly cite 28 U.S.C. §1491, popularly known as The Tucker Act, as the basis for this Court's jurisdiction in the Plaintiff's transferred Complaint. The Defendant's second and substantive argument, alleges that the Plaintiff failed to demonstrate that his claims are "money-mandating" as required to invoke the jurisdictional provisions of the Tucker Act.

In the alternative, the United States argues that the Plaintiff's Complaint should be dismissed under Rule 12(b)(6) under one of two theories, either 1) that the VA's right to retain any surplus is allowed under state law, regardless of any lack of authority from Congress, or 2) that Federal law bars the Plaintiff's claim because the Secretary of the VA is somehow prohibited from returning any such surplus.

**DEFENDANT'S 12(b)(1) ARGUMENTS**

**1) Alleged Procedural Defect of Plaintiff's Counsel for Failing to Properly Plead the Basis for this Court's Jurisdiction**

The Defendant's procedural argument must fail for the simple reason that the counsel for the United States apparently neglected to read the rules applicable to transferred cases. Rule 3.1 of the Court of Federal Claims Rules of Civil Procedure entitled "Transfers and Referrals" specifically allows the transferring Plaintiff to file *the same Complaint* filed in the original court. Rule 3.1(a)(2). Rule 3.1(a)(2) only requires the transferring Plaintiff to modify the caption of the case to meet the standards of this Court. It is axiomatic that refileing a Complaint originally filed in another Federal Court (in this case the District Court for the Middle District of Florida) will

not contain a specific statement alleging the basis for the jurisdiction in the Court of Federal Claims.

There is a very good reason why Rule 3.1 does not require the transferring Plaintiff to reiterate the basis for this Court's jurisdiction in the refilled Complaint: The Plaintiff already did so as part of his Motion to Transfer the instant action to this Court. In order to transfer this case from the District Court, the Plaintiff had to demonstrate that jurisdiction was proper in the Court of Federal Claims. Plaintiff's Motion properly cited 28 U.S.C §1491 (the Tucker Act) as invoking the jurisdiction of this Court. This Motion, together with the District Court's Order for Transfer were transmitted to, and filed in, this Court pursuant to Rule 3.1(a)(1).

Further, even the case relied upon by the Defendant does not require a statement of this Court's jurisdiction within the transferred Complaint. The Defendant quotes from Eubanks v. United States, 25 Cl. Ct. 131 (Cl. Ct. 1992) which states: "[t]he **claim** stated in the complaint must fall within the specific categories enumerated by the Tucker Act or the **claim** must be dismissed." Id. at 137 (emphasis added). Thus, it is the **claim** put forth by the Plaintiff that must be examined for compliance with the Tucker Act and not a mere statement of jurisdiction which, as previously discussed, would likely be missing from any transferred Complaint.

**2) Response to Defendant's Allegation that the Plaintiff's Claims are not "Money-Mandating" so as to Invoke the Statutory Jurisdiction of the Tucker Act**

In order to make its argument that the Plaintiff's claims are not "money-mandating" within the meaning of the Tucker Act so as to invoke the jurisdiction of this Court, the Defendant grossly oversimplifies the standard by which this Court analyzes what is, and is not, a "money-mandating" claim. The Government focuses on the specific wording of the various statues (namely 38 U.S.C. §3732(a)(1) and 38 C.F.R. §1.967(d)) cited by the Plaintiff to demonstrate

that the Defendant, (via the Veteran's Administration, (VA)), has engaged in various ultra vires acts so as to deny the Plaintiff money. Counsel for the Defendant would have this court believe that without a single, specific, statutory provision providing for a potential payment to the Plaintiff, that the Plaintiff cannot show that his claim is "money-mandating" as contemplated by the Tucker Act. This Court has addressed this very argument and found it to be wholly in error. In Sharp v. United States, 80 Fed. Cl. 422 (Fed. Cl. 2008), this Court addressed the exact argument now presented by the Defendant.

> The Court understands defendant's argument on jurisdiction to be substantially as follows. The Tucker Act grants this Court "jurisdiction to render judgment upon any claim against the United States founded ... upon ... any Act of Congress...." 28 U.S.C. §1491(a)(1). "The Tucker Act itself does not create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of [sovereign immunity effected by] the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages." Because the language "any Act of Congress" in the Tucker Act is singular, defendant contends that this "separate source of substantive law" must be a single, solitary statutory provision, rather than (for example) a group of statutes that read together "create[ ] the right to money damages."
>
> **That is not the Court's understanding of the law.** The "separate source of substantive law" need only be "reasonably amenable to the reading that it mandates a right of recovery in damages." Thus, while a plaintiff may in many cases be able to point to a single statutory provision as by itself mandating the payment of money, the Tucker Act does not require that this be the case. Indeed, both this court and the Federal Circuit have found Tucker Act jurisdiction in cases in which the money-mandating "separate source of substantive law" was a statutory scheme rather than a single statutory provision. Thus, the Court concludes that separate statutory provisions can be read together to create a money-mandating statutory scheme sufficient to create jurisdiction under the Tucker Act. Id. at 426-27 (emphasis added) (internal citations omitted).

In the instant case, the Plaintiff points to both a specific statute and regulation, which, via the failure of the VA to comply with, has created a right to a monetary award for the Plaintiff. Further, the Plaintiff points to the statutory scheme created by Congress as the same evidences Congress' intent behind the creation and existence of the Veteran's Administration, o show that

he VA has acted outside its authority by failing to return certain money to the Plaintiff. There are numerous reasons why the failure of the VA to return money obtained in excess of any money owed by Mr. Anderson to the Veteran's Administration violates the both the specific statutes cited by Mr. Anderson and the statutory scheme and purpose of the Veteran's Administration itself.

**38 U.S.C. §3732(a)(1) is "Money-Mandating" as to Mr. Anderson**

Part of the Plaintiff's claim lies in the abuse of the subrogation power vested in the Veteran's Administration by Congress. Contrary to the position of the Defendant, 38 U.S.C. §3732(a)(1) is in fact a specific limitation on the authority of the VA. 38 U.S.C. §3732(a)(1) states in pertinent part:

> In the event of a default in the payment of any loan guaranteed under this chapter, the holder of the obligation shall notify the Secretary of such default. Upon receipt of such notice, the Secretary may . . . pay to such holder the guarantee of not in excess of the pro rata portion of the amount originally guaranteed. Except as provided in section 3703(e) of this title, if the Secretary makes such a payment, **the Secretary shall be subrogated to the rights of the holder of the obligation *to the extent of the amount paid on the guarantee***.

38 U.S.C. §3732(a)(1) is, by it clear terms, a limitation by Congress on the scope of the VA's right of subrogation. The Government's right of subrogation is specifically limited to the amount the Veteran's Administration pays out to cover the debt of the Veteran, *and no more*. On several occasions in its brief the Defendant tries to deny this clear, unequivocal language of limitation.

The Defendant relies heavily throughout its brief on the case of Gatter v. Nimmo, 672 F.2d 343 (3rd Cir. 1982) for the proposition that 38 U.S.C. §3732(a)(1) is not in fact an explicit limitation on the VA's right of subrogation. Unfortunately for the Defendant, this case has *nothing* to do with the clear, unequivocal limitation on the VA's right of subrogation, but rather

deals with an attempt by the Plaintiff Veterans to impose certain new duties on the VA under certain discretionary language that allows the VA the freedom to do more than simply be subrogated to the rights of the original lien holder. The court in Gatter properly refused to expand this discretionary language as requested by the Plaintiffs in that case. While the court in Gatter properly noted that the section in question was indeed enacted for the benefit of the Government, it in no way held, *nor even suggested*, that the VA's right of subrogation was not in fact limited to the amount owed by the Veteran. The Government's reliance on Gatter is telling and typical of the arguments advanced by the Defendant.

The Defendant cannot get around the fact that once the VA has been reimbursed, its right of subrogation and/or indemnification ends.[1] In the instant case, the Veteran's Administration brought in approximately $65,000 in excess of what it was owed. As a creature of Congress, the VA (or any other Congressionally created entity) can only act within the authority granted to it by Congress. Since there is no provision anywhere within the enabling legislation of the Veteran's Administration for the Administration to keep monies above and beyond its limited right of subrogation, that money must rightfully, and legally, be returned to the Veteran for whom the entire Veteran's Administration was created to assist.

It is the exercise of authority beyond that granted to the Veteran's Administration by Congress via 38 U.S.C §3732(a)(1) (or even 38 C.F.R. §36.4323(e)) and the resulting denial of money rightfully owed to the Plaintiff/Veteran that makes 38 U.S.C. §3732(a)(1) "money-mandating" as to the Plaintiff under the Tucker Act.

[1] 38 C.F.R. §36.4323(e) states in pertinent part, "Any amounts paid by the Administrator on account of the liabilities of any veteran guaranteed or insured under the provisions of 38 U.S.C. Chapter 37 shall constitute a debt owing to the United States by such veteran." This regulation is commonly referred to as the VA's right of indemnification for monies advanced on behalf of a veteran.

**38 C.F.R. § 1.967 is "Money-Mandating" as to Mr. Anderson**

38 C.F.R. §1.967 entitled "Refunds" further supports Mr. Anderson's position that the Veteran's Administration is obligated under its own regulations to return a surplus to the Veteran. In fact, 38 C.F.R. §1.967(d) states that a refund will be made if the Veteran's Administration receives more money than the amount of indebtedness of the Veteran. Using the loan guarantee program as an example, §1.967(d) states:

> . . . where the amount collected exceeds the balance of the indebtedness still in existence *will* a refund be made in the amount of the difference between the two." (emphasis added).

Perhaps most telling is the utterly nonsensical logic employed by the Government to deny the plain language of this regulation. Desperate to exclude Mr. Anderson from the class of Veterans who are entitled to a refund under §1.967(d) the Government states that §1.967(d) is only available to those who owe the Veteran's Administration money. In other words, according to the government's logic, the only Veterans who are eligible for a refund are those Veterans who owe the Administration money. I kid this Court not, that is the position of the Government as to the applicability of §1.967(d) to any Veteran: You can only get a refund . . . if you owe money.

Of course, what the Government's attorneys forget is that Mr. Anderson was indebted to the Veteran's Administration at the point they expended money pursuant to its obligations under the loan guarantee program to payoff Mr. Anderson's debt. The Veteran's Administration then received money when it sold Mr. Anderson's former home. In the process, the VA recouped all of the money it advanced on behalf of Mr. Anderson, and despite the lack of any statutory authority, the VA pocketed the $65,000 difference (minus unknown expenses). In short, the failure of the VA to honor its obligation under 38 C.F.R. §1.967 leads to Mr. Anderson's claim

against the United States for the return of money owed to him and is thus "money-mandating" under the Tucker Act.

Even if this Court finds that an illegal expansion of the limited subrogation rights dictated by 38 U.S.C. §3732(a)(1) does not constitute a money-mandating claim by the Plaintiff; **and** this Court decides that 38 C.F.R. §1.967(d), which obligates the VA to give a refund of money collected in excess of what is owed by the Veteran, is not money-mandating under the Tucker Act, the Plaintiff asks this Court to consider the general statutory scheme, as enacted by Congress, in creating the Veteran's Administration.

**General Statutory Scheme of Congress in Creating the Veteran's Administration**

**The VA Mission Statement**

> To fulfill President Lincoln's promise – "To care for him who shall have borne the battle, and for his widow, and his orphan" – by serving and honoring the men and women who are America's veterans. www.va.gov/opa/fact/index.htm.

There should be little disagreement that the intent of Congress was to create an entitlement program for the benefit of this nation's Veterans. The same is true of the Loan Guarantee Program. In support of what should be obvious, Mr. Anderson has referenced 38 U.S.C. §5302. Mr. Anderson cites this code, not because it directly applies to him, but rather because it supports the notion that the statutory scheme of the Veteran's Administration is to help Veterans, not steal from them. 38 U.S.C. §5302 entitled "Waiver of Recovery of Claims by the United States" authorizes the VA Secretary to forgive or forego collection of money owed the VA even if the money was mistakenly paid to a Veteran. In each case, the only standard to be employed to determine if the debt should be waived, or repayment forgiven, is a determination by the Secretary "that collection of such indebtedness would be against equity and good conscience." This is the ultimate equitable authority. The purpose of this section further supports the notion

that there is a reason why Congress limited the Veteran's Administration's right of subrogation to only the amount expended by the Administration on behalf of the Veteran. That obvious reason being that it would be fundamentally unfair, and contrary to the whole intent of the program, to take money from a veteran in excess of the amount spent on the Veteran.[2]

This opinion was also expressed by the First Circuit Court of Appeals in Fitzgerald v. Cleland, 650 F.2d 360 (1st Cir. 1981), wherein the First Circuit stated:

> Moreover, the loan guarantee act evinces an intent to treat veteran mortgagors favorably, not harshly. Indeed, the very next sentence in § 1816(a) [§1816 was the precursor to §3732] begins by stating "nothing in this section shall preclude any forbearance for the benefit of the veteran." Thus, statutory authorization to "receive security" implies an obligation to treat that security in accordance with ordinary property law principals at least where those principles would prevent inequitably harsh treatment of veteran mortgagors and where the VA has not seen fit to publish regulations to the contrary. Id. at 362.

The very notion that the VA can keep the hard earned equity of a Veteran, functionally punishing the Veteran for having an asset, runs counter the obvious purpose behind Congress's creation of the Veteran's Administration. It is also a disincentive for a Veteran to partake in the Loan Guarantee Program. Under the position advanced by the Defendant, the message from the VA to Veterans is essentially: "Do not become too successful, do not try to build any equity in your home, because if you fall on hard times, we will take it all away." This cannot be the intent of the statutory scheme behind the Veteran's Administration.

If in fact the VA's arguments for keeping a Veteran's equity run counter to the underlying intent of Congress, then the general statutory scheme as enacted by Congress must also support the Plaintiff's position that he is entitled to a return of any amounts held by the VA in excess of money expended by the VA. This makes the VA's general statutory scheme

---

[2] Frankly, given the reality of the facts in this case and the otherwise generous nature of the VA, it is somewhat shocking that the Veteran's Administration is actually fighting Mr. Anderson.

"money-mandating" under the Tucker Act as it supports the return of funds to the Plaintiff. See, e.g., Fitzgerald, at 361 (. . . we believe that the VA's authorizing statutes do not allow the retention of this money and that it must be returned to the [veteran].).

**DEFENDANT'S 12(B)(6) MOTION TO DISMISS**

The Defendant moves for dismissal under Rule 12(b)(6) based on three arguments seeking to convince this court that the applicable law must prohibit the Plaintiff's opportunity for recovery. To summarize, the three arguments are as follows: 1) a knowing mischaracterization of the Plaintiff's position and argument; 2) an assertion that state law, (which unquestionably controls as to the procedure for transfer of title upon foreclosure), somehow dictates the VA's authority to keep a surplus in contravention of Federal law. [The Government relies almost exclusively on the case of Grant v. United States Dep't of Veterans Affairs, 827 F. Supp. 418 (S.D. Tex. 1993) in support of this position] and 3) that Federal law requires the Secretary of the VA to keep any and all proceeds resulting from the sale property acquired by the VA. Each of these arguments is fatally flawed and occasionally absurd.

**Applicable Standard**

The Plaintiff has no disagreement with the applicable standard of review as laid out by the Defendant and adopts said standard as laid out on page eleven of the Defendant's brief. It should again be noted that there should be no dispute between the parties as to the applicable facts as they are all a matter of public record but for the amounts expended by the VA on behalf of the Veteran beyond the amount paid to the lender.

**Arguments Advanced by Defendant in Support of 12(b)(6) Motion to Dismiss**

**1) Mischaracterization of the Plaintiff's Claim and Argument**

In an apparent attempt to discredit the Plaintiff's claims, the Defendant makes certain statements as to the arguments put forward by the Plaintiff. The Defendant is correct that the Plaintiff sees no particular problem with the mere passage of time as being a bar to his claim. If the VA chose to hold on the property for a number of years before selling, the VA is certainly entitled to do so, and any surplus would necessarily be reduced by any amounts the VA incurred during such a passage of time, whether those expenses are in the form of real estate taxes, maintenance or other costs.

Contrary to the Defendant's implication, the Plaintiff does not seek to impose any particular duty on the VA to act in any particular way with respect to the property it acquires via payment on its guarantee. Nor does the Plaintiff make any claim on title to the property sold by the VA. Title undeniably transferred under Florida law to the VA and then to a subsequent grantee. The Plaintiff's claim does not sound in tort, breach of contract or any claim on title.

Rather, the Plaintiff simply asserts that after any sale of foreclosed property, the VA necessarily performs a simple mathematical computation for each and every transaction. The VA is credited with the proceeds from the sale, from which it subtracts its expenses and the amount paid out under the guarantee. In the vast preponderance of cases, the result of this calculation is a negative number and the VA follows its regulations to waive the resulting deficiency and extinguishing the obligation of the debtor Veteran to the VA. In those rare cases where the VA realizes a surplus, said surplus must be returned to the Veteran since 1) the VA has no statutory or regulatory authority to keep surplus, 2) the VA has now exceeded its limited right of subrogation and 3) under its own regulations (§1.967(d)), the Veteran is entitled to a

refund of the surplus. In addition to these three simple facts, the Plaintiff would also point out that to hold otherwise would be patently unfair and counter to the Congressional intent behind the creation of the Veteran's Administration. To accept the Government's position, this Court will have to sanction the following inequitable result: In the vast majority of cases, the VA waives the obligation of the Veteran to repay the deficiency that results when the VA sells foreclosed property. This is a windfall for the Veteran who otherwise costs the VA money. In fact, under our tax laws, the forgiveness of debt is considered income. 26 U.S.C. §108. Yet, when a Veteran loses his home, and the VA realizes a windfall, it is the Government's position that the Veteran must lose his accrued equity, ostensibly to help pay for the loan guarantee program.

> Thus, the individual who cost the VA substantial sums of money is rewarded while the Veteran who cost the VA nothing, is penalized.

This could not have been the intent of Congress.

The idea that the Veteran is expected to help finance the loan guarantee program flies in the face of reason. The Plaintiff defies the government to name a single other instance where the VA's budget is dependant on taking the property of a Veteran. The Veteran's Administration exists to oversee a government entitlement program. A program designed to help, not harm, those who have served this country. In every respect, the VA was created to hand out money and services to Veterans. The flow of money is in one direction only. In an attempt to overcome this inevitable result under Federal law, the Government remarkably attempts to supercede Federal law with state law.

**2) Defendant's Attempted Reliance on State Law of Title Conveyance to Overcome the Reality of Federal Law**

The Defendant implicitly acknowledges that there is no statutory or regulatory authority for the VA to keep the surplus above and beyond the amount owed to the VA by the Veteran. The Plaintiff also agrees with the Defendant that state law will always dictate the way in which title is transferred to the VA. The mistake made by the Defendant is in equating transfer of fee title to the VA as simultaneously entitling the VA the right to keep funds over and above what it expended on behalf of the Veteran.

It should be brought to the Court's attention that virtually all of the arguments on both sides of this case have been addressed by our Federal Courts in two cases, one favoring the Plaintiff's position and one favoring the Defendant's. In Fitzgerald v. Cleland, 650 F.2d 360 (1st Cir. 1981) the First Circuit Court of Appeals held that although the VA undoubtedly held fee simple title to the property in question under applicable state law, Federal law controlled whether or not the VA could keep any surplus. In that case, the First Circuit held that the VA could not keep the surplus and entered an award of $15,277.66 in favor of the Veteran. Id. at 363.

In opposition to Fitzgerald, the Defendant relies almost exclusively on Grant v. United States Dep't of Veterans Affairs, 827 F. Supp. 418 (S.D. Tex. 1993) in which a District Court Magistrate held that Texas state law dictated the government's right to keep the surplus after foreclosure transferred title to the VA. In support of its position, the Defendant dutifully recites the reasoning used by the Federal Magistrate.

Perhaps the most shocking oversight by the Grant Magistrate is the basis for his distinguishing the First Circuit case of Fitzgerald from the facts before the Texas District Court. Remarkably, the Grant magistrate stated as follows:

> The Grants cite Fitzgerald v. Cleland, 650 F.2d at 360, in support of their claim for the "surplus." Fitzgerald, however, is inapposite due to the different foreclosure procedures utilized and the specific role assumed by the VA in that situation. In Fitzgerald, the foreclosure process occurred according to Maine law, which permits a one-year redemption period. Id. at 422.

The Texas District Court found Fitzgerald inapposite due to a difference in Maine vs. Texas state law. This suggests that the District Court Magistrate simply did not finish reading the Fitzgerald decision. While the First Circuit did discuss Maine law as it applies to how the VA took fee title, the Circuit Court of Appeals went on to state:

> We need not decide this issue of Maine law, however, because *we believe that, as a matter of federal law, the VA must return the surplus*. Fitzgerald, at 362 (emphasis added).

Fitzgerald specifically holds that Federal law (or the lack thereof), *and not state law* controls whether or not the VA can keep a surplus. Nowhere does the Grant Court discuss the role of Federal law in determining the right of the VA to keep a surplus, the very basis of the holding in Fitzgerald.[3]

The Plaintiff unequivocally acknowledges that if a bank or other lending institution were to foreclose on a piece of property, taking fee simple title via state law, such an entity would be entitled to sell the property and keep any surplus. The obvious difference being that a bank or lending institution is not an entitlement program established by Congress to assist Veterans and

[3] The Grant Court further tries to support its decision by stating that if the VA had to return surpluses than the whole Loan Guarantee Program would be in jeopardy. Grant at 423. And dutifully, the Defendant repeats the claim in its brief with no facts to support the claim. The notion that Congress intended for Veterans to fund the Loan Guarantee Program with lost equity is simply absurd and not worth discussing at length. As a practical matter, surpluses of any size are likely rare events. If there were considerable equity in the property than refinancing or sale would likely occur before foreclosure. Further, in light of the United States recent decision to guarantee about $5 Trillion dollars worth of Fannie Mae and Freddie Mac obligations (Reuters, September 12, 2008), are the attorneys for the United States really worried that the VA's Loan Guarantee Program will fail if the VA stops stealing equity from veterans?

thus constitutionally limited to only that authority which Congress has vested in it. The Government (and court in Grant) conveniently overlooks this "minor" difference.

There is yet another fundamental problem with the Government's position that any and all rights of the Veteran are cut off after the foreclosure sale. If this were true, how could the VA determine the amount of any deficiency if the sale price of the house is not credited to the Veteran? Take the following example: Assume the VA pays $200,000 to payoff a guaranteed loan. The VA then sells the home for $180,000. According to the Government's position in the instant action, the deficiency of the Veteran must be calculated as $200,000 since, according to the Government, the Veteran has no right to any sale proceeds after the VA takes title. Of course, we all know that in fact, the Veteran is credited with the $180,000 sale price so as to reduce the amount of deficiency to $20,000. The Government cannot have it both ways. If you are going to credit the debtor after the foreclosure sale so as to reduce the amount of deficiency, the Government must also have to credit the Veteran whose house produced a surplus.

Echoing the error in Grant, the Government places great weight on how the VA obtained title in Maine versus Texas. This is a distinction without meaning. In both Fitzgerald and Grant, it is undisputed that the VA held fee simple title to both properties, free of *any* claim to title from the foreclosed Veteran. The same is true in the instant case. It simply does not matter how the VA takes title to the property. If such distinctions were important, the end result would be different rights for different Veterans in different states. It is unlikely that Congress intended such a convoluted 50 state scheme be used when it seems clear that the intent of Congress in creating the VA was to have one, all encompassing entitlement program for the benefit of Veterans with rules as to VA's right of subrogation, indemnification and obligation to provide refunds of excess money received.

The question of how state law transfers title upon foreclosure has nothing to do with the authority of the VA to keep a surplus without a Federal law authorizing the same.[4] Several Federal Courts have pronounced that the relationship between the Veteran and the Veteran's Administration is governed solely by Federal law. See, e.g., Carter v. Derwinski, 987 F.2d 611 at 622 (9th Cir. 1993) (When a veteran takes advantage of the VA guarantee program, two legal relationships are established, both of which are governed by Federal law. First, the VA promises to reimburse the lender if the veteran defaults, up to the face value of the guarantee. 38 C.F.R. §36.4321. Second, the veteran promises to reimburse the VA for any amounts the VA pays the lender. Id. at § 36.4323(e)); Davis v. Nat'l Homes Acceptance Corp., 523 F. Supp. 477 at 479 (D.C. Ala. 1981) ([veterans] are under an independent obligation to indemnify VA for amounts paid under the guarantee, and the terms of the guarantee are governed by federal law.)

Thus the ultimate issue before this Court is remarkably simple. Is a Federal entitlement program's right to keep the surplus of a Veteran controlled by Federal or state law? If Federal law controls then the Plaintiff prevails, if state law controls then the Government prevails. Realizing this would be the ultimate question before this Court, the Government makes a last ditch attempt to suggest that there is something in Federal law, outside the laws governing (and limiting) the Veteran's Administration, that can save the day and trump the clear intent of Congress to establish an entitlement program that benefits, not penalizes, Veterans.

### 3) Defendant's Claim That Changes to the Law Since 1989 Require the Veteran's Administration to Keep Any Surplus

In light of Fitzgerald, the questionable logic of Grant, and the clear intent of Congress to limit the VA's ability to collect more than what it paid on behalf of a Veteran (either via

---

[4] This argument also alleviates the Grant court's concern that requiring the VA to give up any surplus would somehow "create a federal common law of mortgages." Grant, at 421.

subrogation or indemnification) the Government must try to find some outside basis to keep the surplus. Footnote 3 and Part II B 2 of the Defendant's brief are dedicated to this attempt. In its final volley, the Government blends a myriad or arguments and unsupported statements together in the hopes that something sticks. Interestingly, nothing the Government suggests in its Part II B 2 is at odds with the Plaintiff's position. The Government again makes certain, incorrect statements about the Plaintiff's claim to make said claim less palatable, but upon closer inspection, Part II B 2 does nothing to defeat the Plaintiff's true allegations.

After a brief introduction to some of the procedures and policies underpinning the Loan Guarantee Program, the Defendant makes the following statement: "Noticeably absent from Chapter 37 is a provision that requires – or permits – the Secretary to remit to a veteran the sales proceed of a VA-acquired property." Far from being a change from 1989, it appears that the status quo has been maintained since that time. In 1981 the Court in Fitzgerald noted the absence of any statutory authority for the VA to remit or keep a surplus:

> In this instance, since the statute expressly commands neither the holding of the surplus nor the return of the surplus and the VA has promulgated no rule, . . . . Id. at 362.

Strangely, the Government then repeats its argument that §3732(a)(1), (despite its clear, unequivocal language), does not place a limit of the VA's right of subrogation. Again, the Government improperly relies on Gatter, to support the position. As discussed infra, not only does §3732(a)(1) speak for itself in clear, unambiguous terms, but Gatter is wholly inapplicable as support for the Government's position that the VA's right of subrogation is not limited to the amount expended on behalf of the Veteran. Gatter simply does not say what the Government wants or needs it to say.

The Government then goes on to suggest that the Plaintiff's argument would somehow limit the way the VA could manage, maintain and dispose of properties it acquires. The Plaintiff is at a complete loss to understand why the Government makes this statement. Again, as stated infra, Mr. Anderson does not suggest there is any duty on the VA to do (or not do) anything. Presumably, the VA will act in whatever way it feels is best to try and obtain the best price and return as much money to the public coffers as possible, (subject only to Congress's intent that the VA only recoup only the amount it expended on behalf of any particular Veteran). Contrary to the Government's assertions, Mr. Anderson does not dispute that the VA can be reimbursed for any and all expenses incurred while holding the property. It does so via its right of indemnification discussed infra. However, at the end of the day, after the property is sold, the Veteran should obtain any available surplus, after all expenses have been accounted for.[5]

The Government further suggests that the Plaintiff's arguments would somehow limit the VA's right to reimbursement via is right of indemnification. Again, nothing could be further from the truth. Mr. Anderson acknowledges that the VA has a statutory right of indemnification for reimbursement of amounts spent on his behalf via 38 C.F.R. §36.4323(e). However, any claim of indemnification is necessarily limited to the amount of money the VA actually spent on behalf of the Veteran. Apparently, the Government suggests that the VA should be able to impermissibly and illegally expand its right of indemnification to lay claim to amounts in excess of that expended by the VA on behalf of the Veteran. This argument may necessitate the Plaintiff amending his Complaint to include a count for ultra vires acts in excess of the VA's indemnification authority under 38 C.F.R. §36.4323(e) if in fact the VA is attempting to assert

[5] The Court will note that twice the Plaintiff has asserted that there are no material facts in dispute between the parties as they are all a matter of public record. The only information needed, and the Plaintiff has informally asked the Defendant to supply this, is an accounting of the expenses incurred by the VA while it held the property or as incidental to the sale thereof.

that its indemnification authority can be used to justify keeping the surplus rightfully belonging to Mr. Anderson.

Changing course yet again, the Government attempts to equate a Congressional requirement that the VA account for all proceeds derived from the sale of foreclosed properties, and to deposit said funds into the Veterans Housing Benefits Program Fund as being equal to a right to keep a surplus above and beyond what is owed to the VA by a particular Veteran. There is no logical or factual basis to make this claim. It is apples and chainsaws.

Obviously the VA is expected to sell the properties its takes title to and add the proceeds it is entitled to, to the Veterans Housing Benefits Program Fund. After all, this is where the money came from that paid off the underlying guarantee that allowed the VA to take title in the first place. And, this is presumably the source of the funds for various expenses advanced on behalf of the Veteran to maintain and sell the property. However, just because the VA has to account for the money it takes in does not somehow change the statutory framework wherein the VA is entitled to only the money it expended on behalf of the Veteran (Plaintiff will herein add, "plus expenses" if it appeases the Government) whether via its limited subrogation right, or concurrent right of indemnification for amounts expended on behalf of the Veteran.[6] This argument was specifically addressed by the Circuit Court of Appeals in Fitzgerald:

> Th[e] provision, which states that "the proceeds from the sale of property disposed of" shall be "deposited in the (Loan Guaranty Revolving) Fund", *surely means "proceeds" to which the VA is entitled*, excluding expenses and other legitimate claims against the property and its proceeds. Id. at 363 (emphasis added).

> [Shifting gears again, the Government takes another stab at its state law arguments.]

[6] In fact, the Defendant should read Affirmative Defense number five in the answer submitted by the VA in the Florida District Court wherein the VA plead as a defense the right to reduce any amount owed to Mr. Anderson by the amount of the costs and expenses associated with the sale of the property. Plaintiff does not disagree.

Nothing in Defendant's Part II B 2 addresses why the VA gets to keep money above what was expended on behalf of the Veteran. Part II B 2 is little more than an unfounded assertion that the VA is prohibited to return any surplus. This assertion runs counter to 1) 38 C.F.R §1.967(d), which mandates refunds, 2) the very purpose of any limitation on the VA's right of subrogation and indemnification, 3) 38 U.S.C. §5302, wherein the Secretary can waive indebtedness and repayment of money to the VA based on nothing more than "equity and good conscience," and 4) the very purpose of the Veteran's Administration as an administrator of an entitlement program to *benefit* Veterans.

**CONCLUSION**

The Plaintiff properly invoked the jurisdiction of this Court in its Motion to Transfer as the same is filed with this Court. Further, the Plaintiff has met his burden in demonstrating more than the mere possibility of success on his claim that under applicable Federal law and VA regulations that he is entitled to the return of money from the Government. Thus, the Plantiff's claim are in fact "money-mandating" as required under the Tucker Act.

In order to prevail on its 12(b)(6) motion, the Defendant must prove that that there is no chance the Plaintiff can prevail under any set of facts presented, as applied to the applicable law. While there are no facts in dispute, it should be clear at that the very least that the law is not as obvious as the Defendant would have this Court believe. If nothing else, the existence of a First Circuit Court of Appeals case holding that Federal law prohibits the VA from keeping a surplus ought to be enough to raise the Plaintiff's claims beyond "mere speculation" as asserted by the Defendant for the purposes of this 12(b)(6) Motion.

Respectfully submitted,

/s/ Christopher A. Anderson

Christopher A. Anderson, Esq.
Gorham & Gorham
P.O. Box 46 (25 Danielson Pike)
North Scituate, RI 02857
phone: 401 647-1400
facsimile: 401 647-1446
e-mail: CAnderson@GorhamLaw.com